# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 05 2020, 8:26 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT FATHER DE.C.

Deidre L. Monroe
Public Defender's Office
Crown Point, Indiana

ATTORNEY FOR APPELLANT FATHER T.F., SR.

Karyn Price
Lake County Juvenile Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of D.C. and A.C., Minor Children and De.C., Father; and T.F., Jr., Minor Child, and T.F., Sr., Father | November 5, 2020 |
| | Court of Appeals Case No. 20A-JT-1059 |
| De.C., | Appeal from the Lake Superior Court |
| *Appellant-Respondent,* | The Honorable Thomas P. Stefaniak, Jr., Judge |
| v. | Trial Court Cause No. 45D06-1904-JT-121, 45D06-1904-JT-122, 45D06-1904-JT-124 |

The Indiana Department of
Child Services,

*Appellee-Petitioner*

and

T.F., Sr.,

*Appellant-Respondent,*

v.

The Indiana Department of
Child Services,

*Appellee-Petitioner*

**May, Judge.**

[1] De.C. ("Father C.") appeals the termination of his parental rights to his children D.C. and A.C. T.F. Sr. ("Father F.") appeals the termination of his parental rights to his child, T.F. Jr. ("Jr.") (together with D.C. and A.C., collectively, "Children"). Father C. and Father F. both argue the trial court's findings do not support its conclusions that (1) the conditions that resulted in the removal of Children would not be remedied; (2) the continuation of the parent-child relationships posed a threat to the well-being of Children; and (3) termination was in the best interests of Children. We affirm.

# Facts and Procedural History

[2] L.S. ("Mother")[1] gave birth to D.C. on August 21, 2014, and A.C. on December 27, 2015. Father C. is father of D.C. and A.C. On October 2, 2016, the Department of Child Services ("DCS") received a report that Mother was attempting to leave a hospital with D.C. and A.C.,[2] but did not have transportation or car seats. DCS representatives investigated and found Mother, D.C., and A.C., to be dirty and to have an unpleasant odor. Mother subsequently admitted she and the children were homeless.

[3] DCS contacted Father C. from the hospital. Father C. was living in Iowa and was "unable or unwilling" to take custody of D.C. and A.C. (Ex. Vol. I at 13.) Based on Mother's homelessness and Father C.'s inability to care for D.C. and A.C., DCS placed D.C. and A.C. in foster care. On October 4, 2016, DCS filed petitions alleging D.C. and A.C. were Children in Need of Services ("CHINS"). The trial court held an initial hearing on the CHINS petitions on November 9, 2016, and Mother and Father C. admitted D.C. and A.C. were CHINS.

[4] On the same day, the trial court held a dispositional hearing and issued its dispositional order, which required Mother and Father C. to complete a parenting assessment and any recommended treatment and to participate in

---

[1] The trial court also terminated Mother's parental rights to Children, but she does not participate in this appeal.

[2] The record indicates Mother had a third child, J.C., with her at the time, but that child is not a subject of these proceedings.

supervised visitation with D.C. and A.C. Additionally, the trial court ordered Mother to work with a home-based caseworker to secure housing and ordered Father C. to establish paternity of D.C. and A.C.

[5] In a May 2017 progress report, DCS indicated Father C. had not engaged in visitation, had not established paternity, and had not completed the ordered parenting assessment. On June 23, 2017, Mother gave birth to Jr., whose father is Father F. Jr. remained in Mother's custody following his birth. Father F. was incarcerated at the time of Jr.'s birth and has remained incarcerated in Illinois during the entirety of these proceedings. In January 2018, DCS moved to transition D.C. and A.C. back to Mother's care. On March 2, 2018, the trial court placed D.C. and A.C. with Mother for a trial home visit.

[6] On May 7, 2018, Mother obtained a protective order against Father C. based on allegations of domestic and family violence. At a review hearing on the same day, DCS reported Father C. had begun participating in supervised visits with D.C. and A.C. On July 15, 2018, DCS removed Children from Mother's care after A.C. "suffered severe scald bur[n]s to her feet" for which Mother did not seek immediate treatment. (Ex. Vol. I at 72.) Mother reported A.C. "was burned in the bath by [D.C.]." (*Id*.) A.C.'s burns required emergency surgery and skin grafting. Father C. visited A.C. during her hospital stay.

[7] On July 19, 2018, DCS filed a petition alleging Jr. was a CHINS. The trial court held an initial and fact-finding hearing on October 15, 2018. Father F. did not attend due to his incarceration. Mother's whereabouts were unknown.

Based thereon, the trial court adjudicated Jr. as a CHINS. The trial court held a dispositional hearing and issued its dispositional order the same day, which required Father F. "to complete a parenting assessment, initial clinical assessment and once released from jail participate in supervised visitations with [Jr.]." (Father F.'s App. Vol. II at 33.) The last time Mother saw Children or had contact with DCS was December 2018.

[8] On April 8, 2019, the trial court entered an order on its case review and permanency plan hearing. The trial court changed the permanency plan for Children from reunification to termination of parental rights. The DCS progress report noted Father C. had visited with D.C. and A.C. only three times in 2019, was noncompliant with services, and did not have stable housing. The report also noted that Father F. remained incarcerated with a "potential parole date of 3/21/2022 and a projected release date of 3/21/2025," (Ex. Vol. II at 21), had not established paternity of Jr., had not visited with Jr., and had not engaged in services.

[9] On April 25, 2019, DCS filed petitions to terminate Father C.'s parental rights to D.C. and A.C. and a petition to terminate Father F.'s parental rights to Jr. The cases were consolidated and, on June 4, 2019, the trial court held an initial hearing on the termination petitions. In February 2020, Father F. took a DNA test that identified him as the biological father of Jr.[3] On March 11, 2020, the

---

[3] The termination order indicates Father C. also established paternity of D.C. and A.C. at some point during the proceedings, but it does not indicate when that occurred.

trial court held a fact-finding hearing on the termination petitions. Father C. appeared at the fact-finding hearing and Father F. appeared by counsel only because he was incarcerated at the time of the hearing. On May 5, 2020, the trial court entered its order terminating the parental rights of Mother, Father C., and Father F. to their respective children.

## Discussion and Decision

[10]    We review termination of parental rights with great deference. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). We will not reweigh evidence or judge the credibility of witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* In deference to the juvenile court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*, *cert. denied* 534 U.S. 1161 (2002).

[11]    "The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. A juvenile court must subordinate the interests of the parents to those of the child, however, when evaluating the circumstances surrounding a termination. *In re K.S.*, 750 N.E.2d at 837. The right to raise one's own child should not be terminated solely because there is a better home available for the child, *id.*, but parental

rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id*. at 836.

[12] To terminate a parent-child relationship in Indiana, DCS must allege and prove:

> (A) that one (1) of the following is true:
>   (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>   (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
>   (iii) The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
> (B) that one (1) of the following is true:
>   (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>   (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>   (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
> (C) that termination is in the best interests of the child; and
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must provide clear and convincing proof of these allegations. *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009), *reh'g denied*. "[I]f the State fails to prove any one of these statutory elements, then it is not entitled to a judgment terminating parental rights." *Id*. at 1261. Because parents have a constitutionally protected right to establish a home and raise their children, the State "must strictly comply with the statute terminating parental rights." *Platz v. Elkhart Cty. Dep't of Pub. Welfare*, 631 N.E.2d 16, 18 (Ind. Ct. App. 1994).

[13] When, as here, a judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). We determine whether the evidence supports the findings and whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208. Father C. and Father F. do not challenge any of the trial court's findings and thus they stand proven. *See Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992) ("Because Madlem does not challenge the findings of the trial court, they must be accepted as correct.").

## A. Reasonable Probability Conditions Not Remedied

[14] The juvenile court must judge parents' fitness to care for their children at the time of the termination hearing. *In re A.B.*, 924 N.E.2d 666, 670 (Ind. Ct. App.

2010). Evidence of a parent's pattern of unwillingness or lack of commitment to address parenting issues and to cooperate with services "demonstrates the requisite reasonable probability" that the conditions will not change. *Lang v. Starke Cty. OFC*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*.

### 1. In re Father C.

Father C. argues the trial court's findings do not support its conclusion that the conditions that resulted in removal of D.C. and A.C. would not be remedied because "there was never an effort by DCS to reunite [D.C. and A.C.] with [Father C.]" and "the [trial court] did not give any credit to [Father C.] for his significant accomplishments." (Br. of Appellant Father C. at 13.) The trial court entered the following findings in support of its conclusion that the conditions would not be remedied:

> The Department of Child Services received a report alleging neglect. . . . [D.C. and A.C.] were removed from [Mother's] care. [Father C.] was in the State of Iowa and was unable to take custody of [D.C. and A.C.].
>
> * * * * *
>
> [Father C.] appeared at the fact finding hearing and was represented by counsel for the proceedings. [Father C.] is sporadic with the visitations with [D.C. and A.C.]. [Father C.] was to visit twice weekly with [D.C. and A.C.]. [Father C.] has only attended approximately 50% of the scheduled visits. [Father C.] has only been attending the visit [sic] approximately once a month. [Father C.] has a pattern of visiting with [D.C. and A.C.] right before a court hearing and then visits would become sporadic. [Father C.] continuously cancels or no-shows for his

visitations with [D.C. and A.C.]. [Father C.] does not have any real engagement with [D.C. and A.C.]. [Father C.] does not come prepared for the visits. [Father C.] resides in Chicago and transportation was offered for visits. Often times, [D.C. and A.C.] would be transported and [Father C.] would not make himself available.

[Father C.] did establish paternity for [D.C. and A.C.]. The Department of Child Services has been unable to verify [Father C.'s] housing. Service providers were changed on a number of occasions to accommodate [Father C.'s] schedule. [Father C.] would remain sporadic with his compliance with the case plan. [Father C.] has not progressed in the case plan toward reunification.

[Father C.] has a criminal history including incarcerations and work release. Mother currently has an active protective order against [Father C.].

[Father C.] would not allow the case manager to view his home in an attempt for the visitations to progress. [Father C.] would not allow the service providers into his home. [Father C.] has moved at least three times since the CHINS case began. [Father C.] testified he is looking to move again. [Father C.] continuously refused to allow the case manager to view the home. [Father C.] did not ever become vested [sic] in the services offered through the Department of Child Services. Although [Father C.] sporadically visits with [D.C. and A.C.], [Father C.] is in no position to independently parent [D.C. and A.C.] on a daily basis. [Father C.] is not able to care for [D.C. and A.C.'s] basic needs. All efforts to engage [Father C.] in the reunification process have failed.

(Father C.'s App. Vol. II at 3-4) (internal citations omitted).

[16]     Father C. contends he is "in total compliance with his case plan." (Br. of Appellant Father C. at 13.) The trial court's findings indicate otherwise, and Father C. has not advanced an argument that any of those findings are not supported by evidence. Father C.'s argument is an invitation for us to reweigh the evidence and judge the credibility of witnesses, which we cannot do. *See In re D.D.*, 804 N.E.2d at 265 (appellate court cannot reweigh evidence or judge the credibility of witnesses). We therefore conclude that the trial court's findings supported its conclusion that the conditions that resulted in removal of D.C. and A.C. would not be remedied. *See In re G.M.*, 71 N.E.3d 898, 908 (Ind. Ct. App. 2017) (affirming the trial court's conclusion that the conditions under which child was removed from mother's care would not be remedied based on mother's pattern of behavior and noncompliance with services).

## 2. *In re Father F.*

[17]     Father F. argues the trial court's findings do not support its conclusion that the conditions that resulted in Jr.'s removal would not be remedied. In support of its conclusion that the conditions that resulted in Jr.'s removal would not be remedied, the trial court found as follows:

> [Children] were placed on a trial home visit with [Mother] in March 2018, but had to be removed again when [A.C.] was hospitalized in July 2018 with severe burns on her feet. Mother did not seek medical attention in a timely manner. . . . [Jr.] was then also made ward of the Department of Child Services. [Father F.] was incarcerated at this time.

[Father F.] remains incarcerated. [Father F.] was represented by counsel for the termination proceedings and had the opportunity to testify. [Father F.] will remain incarcerated until 2022 and does not have an adequate plan for care or treatment of [Jr.]. [Father F.] was given DNA testing for [Jr.]. [Father F.] is the biological father of [Jr.], but has not established paternity.

[Father F.] has not participated in any services. [Father F.] has no significant bond with [Jr.]. [Father F.] has not ever met [Jr.]. The Department of Child Services is required to provide reasonable efforts to the parties for reunification services. Services were referred to providers, but due to [Father F.'s] high security issues, providers were not allowed. Once [Father F.] was moved to Moline, Illinois, Fatherhood Initiative [S]ervices were offered to [Father F.]. Although, DCS was unable to physically provide the other services, [Father F.'s] place of incarceration usually offers numerous services and programs through their institution. [Father F.] did not voluntarily participate in or provide any proof of any participation in these services. [Father F.] was aware of the CHINS proceedings for [Jr.], and [Father F.] did not contact the Department of Child Services, not until the petition to terminate his parental rights was filed, after [Jr.] was in foster care for over a year. [Father F.] has shown no interest in parenting [Jr.].

Psychological data indicates that crucial socialization for human beings occurs between birth and five years of age. While incarceration hampers a parents [sic] ability to do services, the fact remains that but for [Father F.] committing, and being convicted of Armed Habitual Criminal [sic] and becoming incarcerated on February 15, 2017 while [Jr.] was in utero[,] [Father F.] could have been involved in [Jr.'s] life. [Father F.'s] actions have caused him to never meet his child. [Father F.'s] actions have lead [sic] to his incarceration until at least March 21, 2022. By [Father F.'s] release date [Jr.] will be nearly five

years old. [Father F.'s] past pattern of conduct cannot be ignored.

(Father C.'s App. Vol. II at 3-4) (internal citations omitted).

[18] Father F. contends he "has participated in all the programs that were available to him while he has been incarcerated" and "he can live with his father or mother upon his release and . . . can return to his previous employer that has a program for convicted felons." (Br. of Appellant Father F. at 17.) Father F. maintains that his "release date [from incarceration] is the sole factor that [DCS is using in] recommending termination of parental rights." (*Id.* at 12.) Father F. likens the facts here to those in *K.E. v. Indiana Dept. of Child Servs.*, 39 N.E.3d 641 (Ind. 2015).

[19] In *K.E.*, like here, the father had been incarcerated since K.E.'s birth, as he and the mother were arrested and convicted on drug-related charges when mother was pregnant with K.E. The father was serving a ten-year prison sentence. *Id.* at 644. While incarcerated, the father "completed over twelve programs . . . that relate to self-improvement, parenting, and drug and alcohol abuse." *Id.* Additionally, child's placement, his paternal aunt, took child to visit with his father "for two to three hours at a time" and the father "ma[de] nightly phone calls . . . in order to talk" to his child. *Id.*

[20] During the trial court's termination fact-finding hearing, the Court-Appointed Special Advocate ("CASA")

was willing to recommend that termination of Father's parental rights be delayed until it was determined whether Father's sentence would be modified. The CASA considered the efforts Father had made to complete multiple programs, the bond he had developed with K.E., the fact that Father had not been given the same amount of time and services that DCS made available to Mother, and that a delay would not harm K.E. The CASA felt that a temporary delay in termination of Father's parental rights was merited. Yet, this recommendation was conditioned upon Father being approved for a sentence modification, and the CASA recommended termination if Father would not be released until September of 2016.

*Id*. at 644-5. The trial court terminated father's parental rights to K.E., and father appealed. Our Indiana Supreme Court held:

> [Father's] potential release date is only one consideration of many that may be relevant in a given case. We do not seek to establish a higher burden upon incarcerated parents based upon their possible release dates nor do we believe the burden of proof should be reduced merely because a parent is incarcerated. Because the release date alone is not determinative, we consider whether other evidence, coupled with this consideration, demonstrates by clear and convincing evidence a reasonable probability that Father would be unable to remedy the conditions for removal.
>
> * * * * *
>
> Despite Father's criminal and substance abuse history, his recent improvements at the time of the termination hearing were not balanced against his habitual patterns of conduct. Given the substantial efforts that Father is making to improve his life by learning to become a better parent, establishing a relationship with K.E. . . . and attending substance abuse classes, it was not

proven by clear and convincing evidence that Father could not
remedy the conditions for K.E.'s removal. . . . [T]here is
seemingly nothing else that Father could have been doing to
demonstrate his dedication to obtaining reunification. Because
there was insufficient evidence to establish this factor for
termination, the findings cannot support the conclusion reached
by the trial court, making the conclusion clearly erroneous.

*Id*. at 648-9.

[21] The facts before us are not similar at all. While Father F. signed service copies
of the CHINS petition and related notices, he did not show an interest in
preserving any relationship with Jr. until DCS filed a petition to terminate
Father F.'s parental rights. Father F. contends he completed parenting classes
while incarcerated, however, he did not provide any documentation to support
his testimony regarding the completion of those classes.[4] Finally, Father F. has
never met Jr. and, if Father F. is released from incarceration at the earliest
possible date, Jr. will be five years old by the time of Father F.'s release in 2022.
Based thereon, we conclude the trial court's findings supported its conclusion
that the conditions that resulted in Jr.'s removal would not be remedied. *See In
re K.T.K.*, 989 N.E.2d 1225, 1234 (Ind. 2013) (trial court's findings supported its

---

[4] Father F. also argues DCS violated his due process rights by failing to provide him reunification services
and visitation. However, Father F. did not raise this issue before the trial court, and thus it is waived. *See In
re N.G.*, 51 N.E.3d 1167, 1173 (Ind. 2016) ("party on appeal may waive a constitutional claim, including a
claimed violation of due process rights by raising it for the first time on appeal"). Waiver notwithstanding, it
is well-settled that "failure to provide services does not serve as a basis on which to directly attack a
termination order as contrary to law," *In re H.L.*, 915 N.E.2d 145, 148 n.3 (Ind. Ct. App. 2009), and a failure
to offer services due to incarceration does not "constitute a deprivation of due process rights." *Castro v. State
Ofc. of Family & Children*, 842 N.E.2d 367, 377 (Ind. Ct. App. 2006), *trans. denied*. Father F.'s due process
argument fails.

conclusion that the conditions under which child was removed from mother's care would not be remedied because mother did not consistently participate in services and engaged in criminal behavior).[5]

## B. Best Interests of Children

[22] In determining what is in Children's best interests, a trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 223 (Ind. Ct. App. 2010), *trans. dismissed*. A parent's historical inability to provide a suitable environment, along with the parent's current inability to do so, supports finding termination of parental rights is in the best interests of the child. *In re A.L.H.*, 774 N.E.2d 896, 900 (Ind. Ct. App. 2002). The recommendations of a DCS case manager and court-appointed advocate to terminate parental rights, in addition to evidence that conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in Children's best interests. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

---

[5] Father C. and Father F. also argue the trial court's findings do not support its conclusion that the continuation of the parent-child relationship posed a threat to the well-being of their respective children. However, as the trial court's findings supported its conclusions that the conditions under which their respective children were removed would not be remedied, we need not address that argument. *See In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999) (because statute written in disjunctive, court needs to find only one requirement to terminate parental rights), *reh'g denied*, *trans. denied*, *cert. denied* 534 U.S. 1161 (2002).

### *1. In re Father C.*

Father C. contends the best interests of D.C. and A.C. were "most definitely not served by this ruling[,]" the trial court's order did not take into account that D.C. and A.C. love Father C., and the trial court did not consider the "pain and suffering" it was causing D.C. and A.C. (Br. of Appellant Father C. at 15.) Regarding D.C. and A.C.'s best interests, the trial court found:

> [D.C. and A.C.] are thriving in their current placements. [D.C. and A.C.] are bonded in the placements and all their needs are being met and addressed in their placements. . . . [D.C. and A.C.] are extremely bonded in their home and it would be detrimental for the girls to be removed from that placement.

(Father C.'s App. Vol. II at 4.) During the fact-finding hearing, the Family Case Manager testified:

> At this time it's in the best interest of [D.C. and A.C.] for the termination of parental rights. Although they have a bond with [Father C.] and they love [Father C.], they don't engage with [Father C.]. . . . [D.C. and A.C.] are doing really well in their foster homes. They're thriving. They're meeting their milestones. They're able – they have stability, they have schedules. Moving forward, they have a permanency plan that is in place and effective for them and is doing well with them in their behaviors and schooling.
>
> * * * * *
>
> [D.C. and A.C.] do have a very good, strong bond with [Foster Mom]. They call [Foster Mom] mom. They tell her that they

> love her. They look forward to coming home from school and
> being with her. She treats them very well in her home.

(Tr. Vol. II at 67.) Therefore, based on the Family Case Manager's testimony as well as the trial court's findings that the conditions that resulted in the removal of D.C. and A.C. would not be remedied, we conclude the trial court's findings supported its conclusion that termination of Father C.'s parental rights was in the best interests of D.C. and A.C. *See A.D.S. v. Indiana Dept. of Child Services*, 987 N.E.2d 1150, 1159 (Ind. Ct. App. 2013) (recommendation by family case manager and guardian ad litem, along with the trial court's findings that the conditions under which children were removed from mother's care would not be remedied, supported trial court's conclusion that termination of mother's parental rights was in children's best interests), *trans. denied.*

## 2. In re Father F.

[24] Father F. argues the termination of Father F.'s parental rights is not in Jr.'s best interests. He likens the facts here to those in *In re G.Y.*, wherein mother was G.Y.'s sole caretaker for first twenty months of G.Y.'s life until mother was arrested for Class B felony dealing in cocaine. 904 N.E.2d at 1259. Prior to pleading guilty and facing incarceration, mother unsuccessfully attempted to find a suitable relative with whom G.Y. could stay during mother's incarceration. Mother pled guilty as charged, and the trial court sentenced her to twelve years with four years suspended. DCS removed G.Y. and placed him in foster care; he was subsequently adjudicated a CHINS. *Id.*

[25] Eventually, DCS filed a petition to terminate mother's parental rights to G.Y. because, in part, mother was unavailable to parent G.Y. due to mother's incarceration. During the fact-finding hearing, mother testified that she visited with G.Y. once a month for one to two hours, completed a parenting class, and completed an "inmate to work" program while incarcerated. *Id*. at 1262. She received reductions in her sentence for classes she took while incarcerated. However, the Guardian ad Litem recommended termination of mother's parental rights to G.Y. because G.Y. needed stability and mother's earliest possible release date was approximately two years away. The trial court terminated mother's parental rights to G.Y. *Id*. at 1262.

[26] Mother appealed, arguing termination of her parental rights was not in G.Y.'s best interests. Our Indiana Supreme Court agreed, holding that prior to the CHINS adjudication, "the record gives no indication that Mother was anything but a fit parent[,]" *id*.; that mother's additional education classes had shortened her sentence, that DCS had not demonstrated mother was likely to reoffend, and that mother "maintained a consistent, positive relationship with G.Y." *Id*. at 1264. The Court further noted that while "[p]ermanency is a central consideration in determining the best interests of a child[,]" *id*. at 1265, mother's continued commitment to reunification with G.Y. and her willingness to continue services following her release outweighed the need for immediate permanency through adoption for G.Y. *Id*.

[27] The same is not true here. Father F. has never met Jr. and was incarcerated prior to Jr.'s birth for possession of a handgun with a prior felony. Father F.

has not visited with Jr., could not provide documentation of any parenting classes he attended, and had not received a reduction in his sentence due to availing himself to educational opportunities while incarcerated. The family case manager testified that

> [Jr.] has not known anybody since – as family related, since he was a year old. He has almost been in this home for a whole year. He's doing extremely well. He's come a long way with meeting his milestones in his speech and his physical abilities. So, he has some permanency and some stability in his life at this time.

(Tr. Vol. II at 38.) Based on the family case manager's recommendation and the trial court's conclusion that the conditions that resulted in Jr.'s removal would not be remedied, we conclude the trial court's findings support its conclusion that termination of Father F.'s parental rights to Jr. is in Jr.'s best interests. *See A.D.S.*, 987 N.E.2d at 1159 (recommendation by family case manager and guardian ad litem, along with the trial court's findings that the conditions under children were removed from mother's care would not be remedied, supported trial court's conclusion that termination of mother's parental rights was in children's best interests).

# Conclusion

[28] Regarding all Children, the trial court's findings support its conclusions that the conditions under which Children were removed would not be remedied and that termination of the fathers' parental rights was in Children's best interests.

Accordingly, we affirm the termination of Father C.'s parental rights to D.C. and A.C. and the termination of Father F.'s parental rights to Jr.

[29] Affirmed.

Riley, J., and Altice, J., concur.